Good morning, Your Honors. May it please the Court, my name is Morgan Russell for the petitioner Mario Rodas-Diaz, also known as Juan Gadidas Gonzalez. Can you move just a little closer to the microphone? Sure, thank you. Morgan Russell for the petitioner. Your Honors, this is an unusual case. I think the Court could grant and should grant the petition for review and could do so either on constitutional grounds or on non-constitutional grounds. I think that the due process route makes sense here because what happened before the immigration judge smacks of unfairness. Basically, the petitioner was deprived of an opportunity to present actual, full, live testimony on the record, addressing the key inconsistency that was upheld by the BIA based on what turned out. If you don't mind me, this is the case in which the cross-examination of your client wasn't recorded? Right. Okay. So just help me reconstruct the record. If I remember, the cross-examination is the first time at which your client was confronted with the inconsistency, right? That's right. And all we have are the immigration judge's notes that give like a one-sentence response. Your position is that your client, in fact, gave a much more fulsome response that's not captured in the notes, or what? I have no idea. Okay. So that's what we don't know. Well, that seems like a real problem if you have the burden of showing prejudice, right? Well, so let me just do what you what I heard you say. And the reason I jumped in was that you said he was deprived of an opportunity to put on sort of like a full evidentiary presentation. And I guess my assumption was that, well, no. All he's required to be given is an opportunity to be confronted with the inconsistency, to provide an explanation, and then the I.J. can, you know, make a determination. And it sounds like he was given that opportunity here. Well, in a sense, but there's no we don't know what his I mean, the I.J., in her written decision, said that his explanation for that wasn't thorough or compelling enough. But we don't know what his explanation was. We don't know how thorough it was because all we have are her notes. I think with respect to prejudice, there's, I think, two things that really support an argument as to prejudice. One is that the I.J. herself, after the hearing, before she handed the case off to a law clerk and the written decision was prepared, found him credible and said that she believed him and said credibility wasn't an issue. Sotomayor, I've lost the chronology here. At what point did the I.J. say that give him an opportunity to respond to the inconsistency So that happened according to the I.J.'s bench notes. That happened on the cross-examination at the evidentiary hearing. Then subsequent to that, several months later, she called the party's back end for a status conference and said, you know, I'm sorry, I did not, I failed to record the cross-examination. I do not think credibility is an issue. That given, is it okay if I just read my bench notes into the record? It was after the It was after. After the cross-examination, after the I.J. had noted an inconsistency, after whatever was said in response was said, then the I.J. said, there's no credibility problem, I just want you to know that I don't have the transcript. Right. And then she said, so with that in mind, credibility not an issue, is it okay if I just read my notes into the record? And based on that, you know, finding, that, you know, sort of promise, the party stipulated that she could do so. And then And what would they have, what would the Petitioner have done if she had said credibility may be a problem? Well, according to, according to Petitioner's counsel who represented him at the hearing and also before the BIA, she said she would have, she said she would have redone cross-examination to have a full record and have him have a chance to give a complete explanation and have it be fully on the record. What there's like And that's what she says, that's what counsel, you weren't there. I wasn't there, right. So that's what counsel said when? In her brief to the Board. To the Board. Okay. Now, I don't think that seems kind of not particularly here or there as to prejudice, because, again, that's, you know, counsel's brief. But I think what is important for prejudice is, you know, so first I would point the Court to a case like O'Shodey, the en banc decision, 729F3rd at 890, where the Court said that the critical question for due process is whether an I.J.'s action prevented the introduction of significant testimony. This is not quite like any of these other cases, but here I would say that the I.J. prevented the actual, him having an actual opportunity to present live testimony that's captured on the record, and it's significant because that explanation of this inconsistency is something the Court has held repeatedly, has to be given and has to be provided. But I guess I would have assumed your theory for prejudice was a little bit different, which was simply that when the I.J. made the representation that I don't think credibility is going to be at issue, that if the I.J. had said otherwise, your predecessor, Petitioner's counsel, would have said, well, if that's the case, then we want to make the I object to your one-sentence summary of what his response was, because, in fact, it was much more fulsome, and if, you know, unless counsel for the government is going to stipulate that he said the following 18 things, then I want to basically redo the cross-examination so that we can have a transcribed record. Not that you would necessarily get a brand-new hearing, because he had the opportunity when confronted with the inconsistency the first time. Russell. Right. Well, I don't mean a brand-new hearing, but the choice, the question was whether to redo the cross or to accept having the notes read in. And because the I.J. said I don't think credibility is an issue, everyone agreed to just have the notes read in and go on. I think as to In Oshodi, for example, where there is the I.J. provided much more testimony to be taken, for sure, here, in those cases, the Court has said that where an I.J. prevents the introduction of significant testimony, prejudice is found easily because the testimony could have been compelling, and so it may have affected the outcome of the proceeding. I think here, for prejudice, the fact that the outcome could have been different is illustrated by two things. First, even without looking at the asylum officer's notes, which there's, you know, the motions panel said they couldn't notice, but I know that's subject to your reconsideration. But even without looking at that, the I.J. herself, after the hearing, found him credible. So that's as did the asylum officer before. So I think that's an indication that, you know, before she handed the case off to be written up, she had said on the record that she believed him. That's, you know, closer in time to when she had actually heard his testimony, heard the cross-examination before, you know, the person who the law clerk who wrote up the decision was just relying on the notes. I think that illustrates the outcome really could have been different had he, you know, not stipulated to having the bench notes read in and had the chance to give what certainly could have been a more thorough explanation on the record. The explanation is the one, I gather, that's contained in the asylum officer's notes? And I think that's the other illustration of what a more thorough explanation would have been. Well, okay. I guess I get that as to the original, was it 1992, petition or application, rather? Yeah. But I guess I don't understand for the 2010, if I may, I don't know if I'm getting the years wrong, but there was an updated application at which point I assume he had counsel and they just copied verbatim, I think, the old language. And why would he – I think he signed something saying that this thing had been read to me in my native language and everything in it is accurate. Why does he get a pass for that? Well, I think – I mean, I think it's clear – you know, I don't know exactly what happened there. But it is right that it was copied verbatim from the old application. And we know from, I think, the AO notes demonstrate that at least when he was asked about that before, he explained that it had never been read back to him. I think that strongly suggests it was never read back to him again. He doesn't read English. He signed a form that his attorney gave him to sign. But I think, if anything, that just sort of shows, you know, the further prejudice. I think the fact that the two applications are the same sort of means that, if anything, we should look all the more to the explanation from the asylum officer's notes originally, in which he addressed exactly the same content of what is substantively the very same application and said that it was never read back to him and didn't know what it said. And the asylum officer's notes show that both times he was actually – that he actually testified to an adjudicator about this. He said the persecutor was the guerrillas, not the Army, and that he said that he didn't know – he didn't know what the form – application form contained. I'll save my last minute. Thank you. Roberts. Very good. Let's hear from the government. Good morning, Your Honors. May it please the Court, Alexander Lutsch to the government. Your Honors, this case involves two alleged procedural due process violations, but the Petitioner's arguments fail at the prejudice juncture on both of them. He faults the immigration judge for using bench notes that he's never shown to have been materially inaccurate or omissive and on which the board's decision explicitly refrained from relying. Right. But that's kind of unfair because the IJA had said credibility is not going to be at  the heart of the case, but, Your Honor, you've, you know, willfully sort of underrepresented what he said at the hearing. I mean, the IJA said he was asked this question, here's the – it was like a one-sentence summary, if I remember. Why would the lawyer have had any incentive to say, but, Your Honor, actually you left out the following five paragraphs of testimony that he gave on that point? Well, Your Honor, the immigration – excuse me. The prior counsel for Mr. Geddes had her own notes of cross-examination, and she did use them to correct the immigration judge's bench notes in a couple of respects. But moreover, Your Honors – But the immigration judge said, I don't find – I don't find him – don't find him to be incredible in his testimony, which is why I believe the exact formulation of his answers, if they are slightly different than my notes from what he said, that factual information provided – that the factual information provided is accurate and correct. I fully acknowledge – That's that, then, isn't it? I fully acknowledge that that's in the record, Your Honor. And I'd make a couple of points in response. Number one, there is no indication that the immigration judge was anything other than professional in the conduct of this hearing. This is the only point at which Mr. Geddes – Nobody's saying otherwise. He was – the immigration judge, I don't know whether it was he or she, was perfectly honest. She said, is it okay? I – you know, I don't have it, but credibility is not an issue. I don't find – I find him – what he said was so. Doesn't she even have some sort of obligation to explain afterwards why she's gone back or he's gone back on the – on the statement that was made at the – right after the hearing? No, she didn't, Your Honor, but she did actually do what you're describing anyway when she listed in detail five different grounds for finding Mr. Geddes' testimony not credible. And the point I was trying to make just a minute ago by pointing out that there's nothing else in the record that calls into question the IJA's behavior is that the explanation here that leaps off the pages of the record is just that this was a pre-decisional comment. The record shows that when the immigration judge said this from the bench, they had just started to prepare the written decision, and the immigration judge's law clerk realized, oh, we just forgot to turn on the recorder. But she said it because there was a problem with the record. I'm sorry, Your Honor. She said there's no credibility issue here because there was a problem with the record. And what the IJA was trying to do was to say it's not material, as I understood it. And then the decision comes down, and it turns out it is material. Well, Mr. Geddes had the opportunity to confront those – he was confronted with those problems. He had the opportunity to explain them on cross-examination. And it was captured in a form that's less precise than we would have liked. But at bottom, here's the issue. The only impact of the immigration judge's conduct here on this record, the only thing that results from the immigration judge having made this pre-decisional comment and then later being unable to avoid a credibility finding, is that we get bench notes instead of a verbatim transcript of cross-examination. That's the only impact. So the only way that matters – But can I just stop you? Sure, of course. But the reason that is important here is because the fault the IJA found was that the explanation given for the inconsistency was not thorough in some part, right? It wasn't – I just remember thorough being one of the words. So if that's true, and in fact his testimony on cross, like I said, it was five paragraphs long, not one sentence, then it is problematic that the lawyer didn't have any incentive to try to correct the IJA at that particular moment. Well, I understand Your Honor's point, but they would have had an incentive to make that exact point in their brief to the board. Prior counsel could have said, here's what Mr. Goddides actually said on cross, and this is what got left out. He didn't have a transcript, so how could he – Because prior counsel had their own notes, and because Mr. Goddides had his own memory of cross-examination, and cross-examination was about things that happened to him. It's all about information that he already knew, and he was there answering the questions. There are so many different sources from which Mr. Goddides could have pointed this out. I'm not sure that it would have been favorably considered if he was making it up. I mean, there was no basis for ascertaining that it was accurate. Well, Your Honor, let's look at it a different way. Let's imagine that Mr. Goddides had known farther in advance that there was going to be an issue regarding his credibility, and so he'd shown up at the status conference and he said, nope, I want to have a read-on cross-examination. How does that help him? His cross-examination, if he does a renewed cross-examination, these bench notes are still there. The immigration judge and everybody involved know what he said at the first cross. So he either says the same thing again, we've got the same inconsistencies, a diametric flip-flop between being targeted by the military and targeted by guerrillas, or he changes his testimony, and now we've got new inconsistencies. Well, you're assuming that the bench memo, that the bench notes are accurate. Because nobody's taken a position to the contrary until we get here, Your Honor. Because they were told that it didn't matter. Your Honor, that they were told that before the immigration judge. They had Mr. Goddides had every opportunity on appeal to the board to point this out. At that point, the adverse credibility finding had already been entered. I understand Your Honor's point, what he had no incentive to bring it up before the IJ. But if we accept for a minute that point, he has every opportunity and every incentive to bring it up before the board and say, no, here's what I said, or here's what I didn't say. He's got to show prejudice. And this isn't just a technicality. I mean, a procedural due process claim, it's not just enough to identify that a mistake was made. We really have to show what the problem was that resulted from that mistake. And Mr. Goddides has just never said, here's what I would have said differently. Here's the evidence that didn't get captured. Here's what I would have done. And it's hard to imagine how that could work anyway, where, like I said a minute ago, if he does a redone cross, he either maintains the same inconsistency or creates new ones. I think we do now know what the explanation is, right? And that is that whoever prepared that original application got confused about whether it was the guerrillas or the Guatemalan military. And it was never read to him. He never had a chance to correct it. I'm trying to remember, is there some other later point at which he himself, like during the asylum officer interview, made this mistake? I thought it was just in the applications. Let me just see if I can understand. It was consistent with the statement that he made to the asylum officer, which was never turned over. I'm sorry, Your Honor, I'm just having trouble following the question. You're saying that what he said in the cross-examination. No, no, what he said, what he said, Judge Watford just described, that the, his explanation, and it's further bolstered by the fact, by the asylum officer's in which he, which he was consistent about the fact that, of who, who were actually assaulted and that it was afar. And those notes were never turned over. Well, Your Honor, even setting aside all of our other arguments about these notes, just for a minute, it's, it's impossible to come up with a scenario where these notes really help Mr. Gedidas. Because number one, as Judge Watford pointed out a few moments ago, after he told an asylum officer, that wasn't read back to me, he submits a brand new asylum application with the assistance of counsel where he says exactly the same thing. So we've still got an inconsistency even in the notes come in. And furthermore, as we pointed out in our brief, he's got this inconsistency about the military versus the guerrillas. The notes are just one piece there that really doesn't fix it because he's got this other new application. But the notes introduce new inconsistencies. They tell a whole third story about having his hands tied up and being attacked by a group of people because his brother was in the military. And none of that comes out at any other point. So even if these notes come in, if anything, they create more inconsistencies. And furthermore, he never, before the agency, said, oh yeah, what about these notes? He didn't even have to know about the notes. All he had to know was, I said this at some point. Or he could have just said, my asylum application at the beginning wasn't read back to me. I mean, again, this is all his own testimony. And he's faulting the government for not giving his own statements about facts that have arguable reliability at best and that introduces new inconsistencies into a record that already has inconsistencies. So at bottom, just neither of these documents really is going to make a difference. And Mr. Geddes has the burden to show specifically how either of these alleged errors knocked his proceedings off course. And he's got a number of arguments about that here, but he didn't put any of them before the agency. And at bottom, we can look at what these documents say and see that their impact would have been incredibly limited. Okay. Thank you, counsel. Thank you, Your Honors. Let's hear from rebuttal from Petitioner's counsel. Thank you. My colleague said, I just want to point out, he said that Petitioner's prior counsel corrected the IJ's bench notes in a couple of respects. That's a mischaracterization of the record at AR 128. All she does is identify what exhibits 11 and 12 that were mentioned in the bench notes are. Those are I213s. That's all she says. There's no correction based on her more thorough notes or anything. I'm not maligning the IJ. The IJ who decided this case is actually very experienced. I think what happened here was she herself found him credible. More time passed. The case was handed off to a lock clerk to be written up. No disrespect to the lock clerks in the room either. But I think this exchange was not taken into account. This exchange about stipulating to have the credibility not being an issue was not taken into account when that happened, is what it seems like happened. What was raised to the Board? So the — a complaint that what the IJ did here by disregarding this agreement and finding him incredible was unfair and that it prejudiced him, and that he didn't have an opportunity on the record to explain the inconsistency. All of that was raised to the Board. With respect to whether he, you know, could have — should have said to the Board what he would have said otherwise, the Board doesn't find facts and doesn't accept evidence on an appeal. So I don't really know what counsel means when he says he could have explained that to the Board on appeal. I don't think that's — I don't think that's accurate. The IJ in her decision, I think, also mischaracterized his explanation. She says at AR-73 in the written decision that he — all he said by way of explanation was that he had tried to convey that it was the guerrillas and gave no further explanation. Actually, even just looking at the bench notes, what it says is, I said it was the FAR, and I don't know if they got confused or mistaken, which is more than — which is different and more than what she characterized it as, which is he tried to convey it was the guerrillas. And — What is the — what do you want us to do? So I think — I think that if you find — I think that you can find a due process violation and prejudice. Yeah, but the remedy is what? And remand to the Board to have it go back to the IJ for a new credibility analysis. And I think — and I think to have him have that opportunity to — to give an explanation for this, which I think, especially based on the AO notes, I could see it coming out very differently when he has a chance to explain what seems like happened here, which is that both times an attorney prepared the application, they didn't read it back to him, that all along his account has been that it was — that it was the guerrillas that persecuted him. And then with respect to these sort of further inconsistencies within the AO notes, that's something that the agency will have to address, whether those inconsistencies pre-real I.D. are enough to still find him incredible. But that's not something that's — But those proceedings would be conducted in the context of the existing record? Well, new evidence could be presented. I would certainly file the — the asylum officer's notes as corroboration for the explanation we would expect to have him testify to. But everything that's already there would remain there? Yes. Yes, of course. Okay. Thank you, counsel.
judges: Schroeder, Watford, Korman